IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 18, 2021 Session

## STATE OF TENNESSEE v. JAY W. EDWARDS

**Appeal from the Criminal Court for Knox County
No. 112890     Bob McGee, Judge**

### No. E2019-02176-CCA-R3-CD

Aggrieved of his Knox County Criminal Court jury convictions of aggravated kidnapping, assault, domestic assault, and interfering with an emergency call, the defendant, Jay W. Edwards, appeals. The defendant challenges the trial court's denial of his motion to suppress the evidence seized following his arrest, the propriety of the jury instructions, and the sufficiency of the convicting evidence. Following our review, we affirm the defendant's convictions but remand the case for the entry of corrected judgment forms reflecting the merger of the defendant's convictions in Counts 4, 5, 6, and 8.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed; Remanded**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Jonathan Harwell, Assistant District Public Defender (on appeal) and Jedidiah McKeehan and John D. Haines, Knoxville, Tennessee (at trial), for the appellant, Jay W. Edwards.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Charme P. Allen, District Attorney General; and Danielle Jones and Sean McDermott, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Knox County Grand Jury charged the defendant with the following offenses related to an attack on the victim, his wife, Jelena Edwards, on September 15, 2017:

| Count | Offense |
|-------|---------|
| 1 | Especially aggravated kidnapping of Jelena Edwards accomplished with a deadly weapon, *see.* T.C.A. § 39-13-305(a)(1) |
| 2 | Especially aggravated kidnapping of Jelena Edwards where Jelena Edwards suffered serious bodily injury, *see* T.C.A. § 39-13-305(a)(4) |
| 3 | Aggravated kidnapping of Jelena Edwards "[w]hile the defendant is in possession of a deadly weapon or threatens the use of a deadly weapon," *see* T.C.A. § 39-13-304(a)(5) |
| 4 | Aggravated assault of Jelena Edwards by causing serious bodily injury, *see* T.C.A. § 39-13-102(a)(1)(A)(i) |
| 5 | Aggravated assault of Jelena Edwards by causing bodily injury and using or displaying a deadly weapon, *see* T.C.A. § 39-13-102(a)(1)(A)(iii) |
| 6 | Aggravated assault of Jelena Edwards by causing her to reasonably fear imminent bodily injury and using or displaying a deadly weapon, *see* T.C.A. § 39-13-102(a)(1)(A)(iii) |
| 7 | Knowingly preventing Jelena Edwards from calling 9-1-1, *see* T.C.A. § 65-21-117(a) |
| 8 | Domestic assault of Jelena Edwards by bodily injury, *see* T.C.A. § 39-13-111 |

At trial, the victim testified that she and the defendant were married on October 5, 2014, and that they were living at Zinc Road in Knox County in September 2017. She recalled that she "had been dying my hair platinum blonde, at my husband's request, for a couple of years" but that after she gave birth to her son in May 2017, she "decided to go back to my natural hair color" due to the time and expense associated with maintaining her blonde hair. She told the defendant of her plan, and he "was not happy" because "he had gotten used to seeing me as a blonde and he wanted me to stay a blonde." When she returned home from the salon on September 13, 2017, with much darker hair, the defendant "was unhappy and he expressed to me how unhappy he was. He told me that he disliked the hair color. He didn't like that I had done that." The couple began to argue, and the defendant "slapped me and threw the wine in my face." The victim said that she "didn't think that that was normal . . . . It was . . . a hair color. I didn't . . . do something that was so terrible to deserve that." The defendant left to go to the store and "sent me a text message, again, restating how displeased he was with the hair color."

The victim, who worked from home full-time, testified that the defendant, a university professor, would care for their infant son on days when he did not have a class. In September 2017, the defendant had been sleeping in an upstairs bonus room for approximately one month. During that period, the defendant would come downstairs to start caring for the baby sometime between 8:30 and 9:30 a.m. to allow the victim to get to work. Although he should have done so on September 14, 2017, "he wasn't coming down." The victim said that she called up to the defendant, and, when she did not receive a

response, she called his cellular telephone and sent him a text message before "physically going upstairs, asking him to come down and he just wouldn't do that." The victim said that, at that point, she was forced to take the baby to his regular babysitter. When she returned home, the victim began her work "in the breakfast area in the kitchen."

At some point, the defendant came downstairs to work in his home office, and the victim "tried starting a conversation with him a few times," but the defendant "just kind of brushed me off." The victim testified that, frustrated with the defendant's behavior, she walked outside to telephone her good friend, Jessica Russell. The two women had a lengthy telephone conversation during which the victim relayed to Ms. Russell "the problems that [the defendant] and I have been having over a few months" including "that incident with the wine." Ms. Russell convinced the victim to come to dinner that evening with her and their other friend, Jill Fuson. The victim agreed, and, after finishing the conversation, she went back inside the house. She recalled having heard "another door downstairs close. And to me, that indicated that somebody else had come inside the house. And I assumed that [the defendant] had been outside listening to the conversation."

The victim testified that Ms. Fuson picked her up that evening and that she took the baby with her to dinner with Ms. Russell and Ms. Fuson. They returned to the Zinc Road residence sometime after 8:30 p.m., and the victim told Ms. Russell and Ms. Fuson that she was "a little bit scared to go back inside the house because of [the defendant's] behavior the last few days and, especially, you know, since a couple nights before." The women agreed to accompany the victim into the house. The victim recalled that she greeted the defendant, "and he doesn't say anything to me. And then they greet him and he . . . greets them back." The defendant remarked that he had not been expecting company that late in the evening. At that point, the victim said, she "could tell that they felt uncomfortable being there" and "they didn't stay very long after that." The victim testified that after Ms. Russell and Ms. Fuson left, she tried to talk to the defendant, but "[h]e wasn't responsive."

After trying unsuccessfully to communicate with the defendant, the victim went to the laundry room to get the laundry from the dryer and fold it. The victim recalled that as she was "pulling the clothes out of the dryer, [the defendant] comes in after me and he tells me that he overheard the conversation with Jessica that day, and he starts hitting me, punching me in the stomach area and then hitting me across the face." The victim said that the defendant "would hit me half a dozen times and then stop and back up and start talking at me, telling me that I'm a bad wife, that . . . I shouldn't be doing what I'm doing. I shouldn't be dying my hair, that he finds me unattractive, just comments -- similar comments to that." The victim recalled that the defendant "punched me in the stomach area and hit me across my face with [an] open hand several times" and that he prevented her from leaving the laundry room by "standing in the doorway." "I try to protect myself

by raising my arms and shielding my body while we were in there." After approximately "10 to 15 minutes," the defendant backed out of the laundry room. The victim followed the defendant into the kitchen "just kind of trying to see what he'll do next."

The victim testified that as the defendant began walking toward the family room, he asked her where she had put both of her cellular telephones, and she refused to tell him "because at this point I'm terrified why he wants my phones and what he's going to do." At that point, the defendant then walked into the family room, "reach[ed] in the diaper bag and pull[ed] both of the phones out." The defendant began "going through my phones, looking." He demanded her password. She could not remember "if he hit me again to get that out of me, but I did give him my password. And he gets into my phones. And I see him kind of going through the phones, you know, hitting various buttons." The defendant demanded that the victim sit on the couch in the family room. As she sat down, the defendant started "attacking me again. He starts hitting me in the same manner, punching me, hitting me across the face. I'm raising my arms at this point. I'm asking him to stop. I'm asking him not to hurt me. I asked him why he's doing this." The defendant told the victim that she had "made this marriage horrible for him; that I am doing things to disobey him; that I'm not obliging by what he wants." The victim recalled that, at some point while they were in the family room, the defendant "pulled out his gun. . . . And he says, I want you to see that there is one bullet in the chamber. I want you to see. And he makes me look at the gun." She said that the defendant "typically always had [the gun] pretty close to him" and loaded. After she looked at the gun, the defendant "starts striking me again."

Eventually, the victim demanded that the defendant return her telephones and told him that she was going to call the police. The defendant pretended to hand her one of the phones "and then he says -- and I'll never forget this -- he says, 'Go ahead and let's see if you're still alive when they get here.'" At that point, the baby, who had been in his swing in the family room, began to cry, and the defendant allowed the victim to go into the kitchen to prepare a bottle and then to feed the baby. She said that the defendant struck her "multiple times while I'm feeding the baby," and, "at one point, he takes the gun and points it at my head and he tells me, do you want Knox to grow up without a mommy?" When the baby finished his bottle, the defendant took the baby from the victim and struck her again. After the baby fell asleep, the defendant permitted the victim to put the baby down on the bed in the master bedroom.

The victim testified that when she sat down next to the baby on the bed, the defendant "drug me off the bed by my leg and kicked me when I was on the floor." The defendant then "steps back and starts talking to me and telling me about what a bad wife I am and just . . . . lecturing." Following this exchange, the defendant permitted the victim to go into the kitchen to wash the baby's bottle while he was "scrolling through my

-4-

phones." The victim said that she "debat[ed] running out the door" but she "did not want to leave my baby in there." She was also worried that the defendant would be alerted to her escape by the home's security system, which came with "an app that both he and I had on our phones and we could enable and disable the alarm and . . . see all the cameras. And it's pretty advanced." While she was in the kitchen, where the defendant "cannot see me, obviously," she opened her laptop and sent an email to her sister, Maja Mandusic, asking her to call the police. She then went back to the sink and continued washing the bottle.

When the victim returned to the bedroom, she told the defendant that she needed to finish a project for work and asked if she could get on the computer to finish the job, "[a]nd by God's grace, he agrees." She got onto the laptop and "pull[ed] up my work documents and systems and then I start Googling how to contact for help." She said that she wanted to find a way to "message 911, how to e-mail 911." When she found no information, she sent another email to her sister and one to her parents "in hopes of sending it to more than one person would increase the possibilities of somebody seeing the email." In her second email to her sister, which she sent at 1:56 a.m., the victim said, "I hope you're checking your email. [The defendant] has both of my phones and he has beat the crap out of me. Call the cops. He's been texting you from my phone." In those text messages, which were exhibited at trial, the defendant told Ms. Mandusic that it was "very inappropriate for [the victim] to share our challenges with you," that none of the victim's family would be welcomed in his home anymore, and that Ms. Mandusic and the rest of the victim's family "are garbage," "especially" the victim's mother.

At 2:14 a.m., one of the security cameras picked up movement in front of the house and sent a notification. The victim explained, "So we get notified by the alarm system that the cops are in front of the house before they actually approach the house." The defendant "turned one of the lights off downstairs and tells me to go into the guest bathroom on the first floor." The defendant followed her into the bathroom with the gun. When they heard knocking at the door, the defendant told her to be quiet. As they hid in the bathroom, her family began "calling one of my phones." The defendant answered the telephone and handed it to the victim. The victim's mother was on the phone. A short time later, the phone rang again with a Knoxville number, and she told the defendant that "those are probably the cops" and that they should answer. At that point, she said, the defendant's demeanor changed; "he's not violent and angry anymore at me. He is scared." The defendant started "rambling on about how he's afraid and he doesn't know what's going to happen. He is talking about how he is black and I'm white and how, if you know, the cops come in, they're immediately going to assume that he is the bad guy and that he did something wrong." The victim said that she promised the defendant that, if he would allow her to answer the telephone, she would tell the police that "everything's okay. I'll assure them that there's nothing wrong." He let her answer the phone, "but he's telling me what to say in the background. He's right next to me with the gun. He's not pointing the

gun at me, but he has the gun on him. And I wanted to scream into the phone, help me, please, I'm in the bathroom, but I knew by the time I got that out, I could be dead."

The victim testified that she tried to convince the defendant to go outside by telling him that she would "stand by your side and I will assure them that we are okay." The defendant eventually agreed but stopped just outside the bathroom when he noticed "a bruise starting to form on the right side of my head." The defendant applied makeup to her face and agreed to let her go outside. "And we start towards the door, at which point he grabs my hand and pulls me back and he says, no. No. No. We are not going out there. They cannot come in here without a warrant. We are not going out there willingly." The victim said that she thought about running out the door but did not want to leave the baby. The defendant then directed the victim into the master bedroom. At one point, the victim and the defendant walked toward the front door to see if the police were still outside. The victim said that she "couldn't see them through the front door" and that the defendant led her back into the master bedroom. She said that she accompanied the defendant "[b]ecause I believe he still had his gun on him, and if not on him, it was near him."

While they waited, the victim told the defendant that she needed her "phones back so that I can turn on the app" with which she tracked her breastfeeding schedule. When the defendant returned her "personal phone," she sent a text message to her family and told them to tell the police to break into the house. Text messages that the victim exchanged with her mother and sister showed that, at 3:07 a.m., she texted her family that the defendant would not let her leave the master bedroom and that he was "pacing the house." The victim texted that she was scared of the defendant, that her "face is bruised and swollen," and that the defendant had told her that the police could not "break in without a warrant." At one point, the victim texted Ms. Mandusic, "Why did you call the police?" She explained, "All of the messages I just read, as I would send them, I would delete them immediately from my phone. [The defendant] approached me at this point and he looked at my phone" and told the victim to "ask her, why did you call the police?" The defendant also told her "to text, stop it. Stop -- tell them to stop. So I text her these two messages that say 'Stop it. Stop it now.'" After some back and forth, she texted Ms. Mandusic, "'He won't let me answer the door!! He has a gun.'" Shortly thereafter, she sent Ms. Mandusic three pictures of her face, which pictures showed redness around the victim's left eye and cheek and a cut inside her lip. She identified the three pictures that she sent to Ms. Mandusic and noted that "this was after the makeup was applied." The victim then texted, "Save them I've deleted them." The victim testified that she did not leave at that point, even though the defendant had gone into another part of the house, "[b]ecause he still had a gun." She added,

> It's dark outside. I'm in pain. I'm post-partum. I have a three-
> month-old baby. I can't move very fast. I'm afraid he'll outrun

-6-

me.  There are no homes -- our neighborhood's very dark. . . . I'm thinking about leaving the whole time, but I just don't think that I am capable of escaping him as fast with the baby in my arms, that I would be able to outrun him.

The victim testified that the defendant returned to the bedroom, took the telephones from her, and told her that he intended to "scrub" them "for any evidence against him, to make sure there's nothing in there that could implicate him, that he's done anything bad."  He also told her that they should send Ms. Mandusic a picture of the victim's face and "said, 'Smile.  Let's show her how pretty you are.'"  After sending the picture, the defendant texted:

> She's fine . . . notice her hair is up . . . from her email to you Maja one would think otherwise . . . [the victim] is lost right now . . . you two are not helping her, us or Knox by allowing her to mislead you two about me to gain support . . . [the victim] is overwhelmed with motherhood . . . her body, emotions and hormones are imbalanced . . . as to why her [sic] she writes you about me . . . tonight will forever change things between us . . . Rose [the victim] will be just as miserable as you are . . . your marriage is fouled up and because of her association with you . . . she dumps all your negative energy on me . . . she is using you both and further destroying us in the process with your support . . . please don't call the police again from Augusta . . .
> Rose . . . she will talk to you in the morning . . . she's tired and embarrassed . . . she doesn't want to talk to you right now . . .

(ellipses in original text).  The victim described her expression in the picture as "terrified."

At 6:25 a.m., the victim and Ms. Mandusic began texting one another in Serbo-Croatian, their native language.  The victim asked Ms. Mandusic to ask the police "where I can go to make report without them coming in the house."  She told Ms. Mandusic that she wanted to "pack some things" and expressed concern about what would happen to the defendant.  The victim texted that she wanted the police to take the defendant from the house only "long enough so that I can get ready Knox's milk out of the fridge, and the pump, and clothes for the two of us."  She also asked Ms. Mandusic to contact a co-worker to let them know she was "dealing with family issues."  The victim reiterated that she was scared and said that she had not slept.  She apologized for involving Ms. Mandusic.

The victim testified that the defendant continued to pace around the house while she remained in the master bedroom with the baby. She said that she was certain that the defendant did not leave because she did not hear him disable the alarm or open the garage door. Additionally, she heard "some noise upstairs," which led her to "assume that he was upstairs." She said that she was "scared of the police coming again" because she did not know how the defendant might react. At 8:02 a.m., the victim texted Ms. Mandusic, "OMG, there are cops with guns at the door." When she heard "banging on the door," she got up from the bed in the master bedroom, where she had been lying down next to the baby, and went into the bathroom to look out the window. She saw "a police officer with a sniper pointing at the front door, standing on the lawn." She said that she did not go to the door because she did not know where the defendant was, saying, "I don't know if he's sitting on the stairs with a gun pointed at the door."

The police eventually forced their way into the house and took the defendant into custody. Emergency personnel examined her at the scene, and the police took photographs of her injuries. She identified photographs depicting numerous bruises to her face and body. The victim refused to go to the hospital because she did not want to leave the baby and because she "was scared. I didn't know what was going on. And I didn't feel like I was broken enough to go to the hospital." On the following day, she traveled to her parents' home and went to the emergency room at their behest. She identified photographs taken on that day documenting her injuries, which injuries included a cracked rib.

During cross-examination, the victim acknowledged that the defendant was not always present in the same room with her throughout the evening and that, as a result, he did not physically restrain her at all times. She said that, instead, it was the potential threat of violence that prevented her leaving. The victim admitted that, in giving her permission to work on her laptop, the defendant would have been aware that she had access to email. She agreed that the defendant's behavior changed after the police arrived and that he did not want the police to discover what had happened.

Jessica Russell, a neighbor and friend of the defendant and the victim, testified that on September 14, 2017, the victim called her and told her that she had gotten her hair cut and dyed and that the defendant was upset with her. The victim told Ms. Russell that the defendant "threw a glass of wine at her and slapped her across the face." Ms. Russell said that they "had a girls' night planned that night" with Ms. Fuson and that, although the victim was initially hesitant, she agreed to go. The three women went out to dinner, and the victim brought her infant son with her. When they returned to the victim's house, the victim said that she did not "feel comfortable going back in the house" because she was scared of the defendant. Ms. Russell and Ms. Fuson agreed to go inside with her and promised that they would not let the defendant "know that you told us some stuff." When they came inside, the defendant said, "Jelena, don't you think you should have asked

to have friends over?"  Ms. Russell said that the defendant's comment felt "out of place."  Shortly after that, Ms. Russell and Ms. Fuson left.

Ms. Russell testified that the victim sent a text message on the group chat that the three women shared a short time later and apologized for the defendant's behavior.  Ms. Russell "responded back with one simple phrase, don't apologize for that jerk.  Love you."  She recalled that Ms. Fuson "responded back with, we need a code, code red, and this goes for all of us.  If anything ever happens, just send that code."  Later, the defendant sent both women a text from the victim's cellular telephone that said:

> Jill and Jessica . . . this is Jay . . . I was displeased that [the victim] did not ask me and/or let me know you guys were coming over . . . as wives . . . if your husband brought over two guest[s] unannounced after 9pm . . . your response would be par mild as I . . . thank you for your support for Jelena Jessica and disrespectful comment towards me . . . Jessica I read you[r] string of text with Jelena . . . shocked you would place yourself in my home with such strong opinions of me . . . for that Jessica you are not welcome in my house . . . .

(ellipses in original text).

Ms. Russell said that she left her home at approximately 8:00 a.m. on the following morning to take her child to the doctor and observed that "their house was just lit up with cop cars and ambulance and fire truck."  Ms. Russell pulled into the Edwards' driveway and told the police officers that she "was with her the night before and everything that she had told us about Jay."  The officers told her to go on to the doctor's appointment and that she would be able to see the victim afterwards.  "And that's what I did.  And they asked for my phone so they could get all the text messages that Jay text[ed] . . . me and my husband throughout the night while we were sleeping."  When she finally saw the victim, the victim was "very shaken up.  She was crying. . . .  Her face was swollen."  She identified photographs of the victim depicting her appearance that morning and said that the photographs did not adequately capture the swelling of the victim's face.

Jill Fuson, a neighbor and friend of the defendant and the victim testified that on September 14, 2017, she, Ms. Russell, and the victim planned to have "a night out, just the girls, and take Knox, 'cause he was little at the time.  And we were going to go eat dinner, just a little time away and just a girls' night out."  She recalled that when she picked the victim up from her residence that night, the victim "was very disheveled.  She was very nervous.  I could tell something was wrong, but when I asked her, she said, oh, nothing."  Ms. Fuson noticed that the victim "had dyed her hair back to her normal color" and

commented on "how pretty she was." Ms. Fuson said that the victim eventually "explained that [the defendant] had thrown wine in her face and slapped her and . . . she was very upset."

Ms. Fuson testified that when the women returned to the victim's residence, the victim became "upset. And she said she'd never gone in the house with it being dark outside and she didn't feel comfortable going in by herself and Knox. So . . . Jessica and I both went in with her." Ms. Fuson said that, because she "had a good relationship with" the defendant, she "just sat down" and started talking to him. She recalled that the defendant "spoke with me very kindly" but then said to the victim "if I had known you were going to have company in, you should have let me know after this . . . hour." Ms. Fuson said that "you could tell there was tension between the" defendant and the victim "and also with Jessica there as well." Ms. Fuson and Ms. Russell left after approximately 15 minutes.

Ms. Fuson confirmed that she received the same text from the defendant via the victim's number that Ms. Russell relayed during her testimony. The message came in at approximately 2:00 a.m. After receiving that message, Ms. Fuson texted the defendant at his own number and asked if everything was okay. She did not receive a reply. The next morning, she received a telephone call from Ms. Russell, "who was totally very upset. I mean, couldn't even understand what she was saying. And she was telling me, 'I think she's dead. I think she's dead.'" Ms. Russell told Ms. Fuson that there were a number of emergency vehicles at the Zinc Road residence. Ms. Fuson testified that she immediately ran down to the house, but officers would not let her inside at that point. They told her that the victim was going to be fine and to come back later. When Ms. Fuson returned later, the victim "just crumbled in my arms. She was so upset." She identified photographs of the victim that depicted how the victim appeared that afternoon. Ms. Fuson said that the victim did not have the red marks on her face the night before.

Maja Mandusic, the victim's sister, testified that in the early morning hours of September 15, 2017, she "received a text message from my sister's phone and it was from [the defendant]. And he said . . . 'This is Jay.'" The message continued:

> Maja . . . it is very inappropriate for [the victim] to share our challenges with you and Rose . . . Rose of all people . . . we made progress since Knox was born . . . now we are back where we were years ago and perhaps further . . . you, Rose and Zac are not welcome here . . .

(ellipses in original text). Ms. Mandusic said that the Rose and Zac mentioned in the text were their parents. At 1:36 a.m., Ms. Mandusic received an email from the victim "[a]nd

the subject line just says, 'Call the cops.' There's nothing in the body of the email." Then, at 1:56 a.m., a second email came in with the subject line, "'Jelena.' And then the body of the e-mail, it says, 'I hope you're checking your e-mail. Jay has both of my phones. And he's beaten he crap out of me. Call the cops. He's been texting you from my phone.'" Ms. Mandusic, who lived in North Augusta, South Carolina "called 911 and they directed me to the . . . Knoxville Sheriff's Department." She asked for someone "to go out and check on them. I need someone to go out there because I'm five hours away."

Ms. Mandusic testified that an Officer Rehg called her and told her that officers were at the Zinc Road residence but "that they're not coming to the door. And I'm being persistent . . . he says it looks like there's no one in the house. I'm being persistent, saying, they're in there. He's probably holding her against her will." Ms. Mandusic said that she was adamant that "they needed to get in there. They needed to make contact with" the victim. Eventually, the officer "was able to get in touch with [the victim], and she told the officers she was okay." Ms. Mandusic recalled that the victim sent her a text message at 2:44 a.m. asking Ms. Mandusic to ask the police to break into the house. Then the victim texted, "They can't break in without warrant, [the defendant] says. Maja, I'm scared. I love you guys. My face is bruised and swollen." Ms. Mandusic texted that the victim should climb out the window, but the victim refused to leave her baby. When Ms. Mandusic reiterated that the victim needed to come out of the house, the victim texted, "Why did you call the police?" Ms. Mandusic responded that the "situation isn't safe for anyone, for you, for [the defendant] or for Knox." The victim texted in response, "'Tell them to come to the front door.' I tell her to, 'Call 911.' She says, 'Stop it. Stop it now.' I said. 'Okay.'" The victim added, "Jay says stop."

Ms. Mandusic testified that at 3:27 a.m., the victim texted, "Are they gone?" Ms. Mandusic replied, "I'm going to sleep. Please resolve this amongst yourselves." The victim told Ms. Mandusic to have the police "come to the back door now," and Ms. Mandusic replied, "They're gone. Please leave me alone now. Work things out with [the defendant]." The victim texted that the defendant "won't let me answer the door. He has a gun." Ms. Mandusic asked the victim to send a picture of her face, and the victim "sends me the first picture and it's followed by several other pictures of her face and her busted lip. She tells me to save them because she's deleted them." Ms. Mandusic sent the pictures to Officer Rehg.

At 4:48 a.m. she received a text from the victim's number that was "a picture of my sister's face" followed by a text from the defendant that says,

> She's fine . . . notice her hair is up . . . from her e-mail to you
> Maja one would think otherwise . . . Jelena is lost right now . .
> . you two are not helping her, us or Knox by allowing her to

-11-

> mislead you two about me to gain support . . . Jelena is
> overwhelmed with motherhood . . . her body, emotions and
> hormones are imbalanced . . . as to why she writes you about
> me . . . tonight will forever change things between us . . . Rose
> Jelena will be just as miserable as you are . . . your marriage is
> fouled up and because of her association with you . . . she
> dumps all your negative energy on me . . . she is using you
> both and further destroying us in the process with your support
> . . . please don't call the police again from Augusta . . .
> Rose she will talk to you in the morning . . . she's tired and
> embarrassed . . . she doesn't want to talk to you right now . . .

(ellipsis in original text). Ms. Mandusic replied, "That will be fine. Just have her call us in the morning." Approximately 45 minutes later, the victim texted that the defendant did not know she had sent the pictures to them. From that point, Ms. Mandusic, the victim, and their mother began communicating in their native language of Serbo-Croatian. The victim wanted Ms. Mandusic to "[a]sk the police where I can go to make a report without them coming to the house." Ms. Mandusic replied that if the victim could get out of the house, then Detective Ferrell, with whom Ms. Mandusic had been in contact, could come and get her. The victim asked what would happen to the defendant and then said that she wanted to pack her things before leaving. Ms. Mandusic told her to forget about her things and just leave with her bag, her baby, and her dog. The victim then told Ms. Mandusic, "I want them to take [the defendant] just long enough for me to get my things, Knox's milk out of the fridge, the pump and clothes for the two of us." She asked Ms. Mandusic "to come and help" and said that Ms. Mandusic would be able to come to the residence "[w]hen they take [the defendant] away." The victim asked Ms. Mandusic to advise her co-worker that she would not be at work that day and apologized to Ms. Mandusic. The victim indicated that she planned to take the baby to the babysitter's and then go to the police. Later, she expressed concern that the defendant would go get the baby from the sitter's while she was at the police station. The victim then sent another picture at 7:17 a.m. to Ms. Mandusic and explained that it had been taken two days before the defendant threw wine on her. She said, "When he saw my new hair, he took a glass of wine and threw it on me. If you take this picture and put it up next to the one he sent you telling you I'm fine, you can see my face is puffy."

During cross-examination, Ms. Mandusic conceded that the victim never alleged that the defendant pointed a gun at her or threatened her with a gun. She clarified during redirect examination that, although she had no personal knowledge whether the defendant had used a gun to hold the victim that evening, she knew that the defendant owned a gun and wanted the police to know that, too.

-12-

Knox County Sheriff's Office ("KCSO") Officer Adam Carver testified that he responded to a call of a domestic assault at 8400 Zinc Road in the early morning hours of September 15, 2017. He explained, "Our dispatch had relayed to us that we had a complainant that was out of state that had called in and said that her sister, at 8400 Zinc Road, had been assaulted and is being held against her will, with possibly a weapon inside the residence." When the officers arrived at the residence, they "park[ed] tactically away from the house" and then walked to the door. Officer Carver observed that there were lights on inside and that the television was on in the living room. "We rang the doorbell, knocked, nobody came." Officer Carver said that the officers walked to the back of the residence and observed an open laptop sitting on the kitchen table. They did not see anyone inside the residence. When surveying the residence, Officer Carver saw

> a camera right at the front door. We noticed that there was a camera sitting on the stairwell that pointed directly at the door. As you went around the residence, there was another camera that pointed down by the garage. And towards the rear of the residence, there was a camera that pointed towards the back door.

He said that the officers saw a light in an upstairs window turn on and off, "[s]o we knew somebody was home, but we couldn't get nobody [sic] to come to the door." Officer Carver recalled that, eventually, the supervising officers made a decision to "go back in service and leave it be." Officer Carver explained that they were at a tactical disadvantage given the cameras and that that disadvantage informed their decision not to force entry at that point. He said that he "did not like that decision" because he felt "that something was wrong and somebody needed help."

During cross-examination, Officer Carver testified that his "beat partner," Officer Brian Rehg, learned from Ms. Mandusic that "[t]here's a possible firearm in the house." Officer Carver denied that the officers broke one of the surveillance cameras outside the house and said that he did not know that a camera had been broken.

KCSO Detective Donald Ferrell testified that in September 2017, he worked in the family crisis unit. In the early morning hours of September 15, 2017, he received a telephone call from the dispatcher "telling me that a patrol unit is on scene somewhere and that they request a call from a family crisis detective." In response, Detective Ferrell telephoned Officer Rehg, who had been dispatched to the Zinc Road residence but had "already been told to clear the call," which Detective Ferrell described as unusual. After gathering information from Officer Rehg, Detective Ferrell contacted his own supervisor and then Ms. Mandusic. After speaking with Ms. Mandusic and after having received the pictures of the victim from her, Detective Ferrell spoke with his supervisor and "the on-

call District Attorney that night, a decision was made to . . . try to obtain a domestic assault warrant."

After he received the warrant for the defendant's arrest, Detective Ferrell contacted his supervisor, who was "just down the street" from the defendant's residence with other officers "so they could see any traffic that came and went from the house." Detective Ferrell said that the officers on the scene remained parked out of sight of the house and approached the house on foot. At approximately 8:00 a.m., officers surrounded the house "to ensure no one runs out the back doors or windows" while the "entry team" approached the door and knocked. Detective Ferrell said that, in some situations, the personnel entering to execute the warrant will remove surveillance cameras from the outside of a residence. He explained, "As far as law enforcement goes, we're at a disadvantage anytime we go to a house, especially when it's a house with cameras, because they know where we're at, but we don't have any idea where they're at." After other officers entered and cleared the house, Detective Ferrell entered the house and spoke to the victim.

Detective Ferrell testified that he observed that the victim had "redness on the eyes and cheeks, slight bruising, like, on the side of the eye, a busted lip and she had a . . . light bruise on the left side of her ribs." The defendant was removed from the residence and placed in the back of a patrol car. Detective Ferrell also spoke to the defendant. When he returned to the Zinc Road residence later that evening to speak with the victim a second time, he saw "more bruising had been developing on other parts, you know, the arms, stuff like that," so he "asked forensics to come out again and photograph, because bruising won't show up right away." He recalled that the victim had bruising to her face and to the left side of her body, starting at her rib cage area and going down her left leg.

KCSO forensic services division employee Rachel Sandlin testified that she entered the Zinc Road residence after officers secured the scene to take photographs, including some that depicted "the weapon and the process of collecting it." The weapon, a Beretta pistol, was found underneath a window. The weapon was loaded with a full clip of hollow point bullets, including one in the chamber. A record check established that the defendant purchased the weapon in Smyrna, Georgia.

During cross-examination, Ms. Sandlin said that she photographed the defendant's hands and did not notice any obvious bruising on his hands. She did notice what "appear[ed] to be a[n] abrasion of sorts on the first finger" of his right hand.

Following a *Momon* colloquy, the defendant elected not to testify and chose to present no proof.

-14-

Based upon this evidence, a Knox County Criminal Court Jury convicted the defendant in Counts 1 and 2 of the lesser included offense of aggravated kidnapping; in Count 3 of aggravated kidnapping; in Counts 4 through 6 of the lesser included offense of assault; in Count 7 of interfering with an emergency call as charged; and in Count 8 of domestic assault as charged. The trial court merged Counts 1, 2, and 3 into a single conviction of aggravated kidnapping and, following a sentencing hearing, imposed a total effective sentence of 10 years.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal. In this appeal, the defendant challenges the denial of his motion to suppress the evidence seized from the Zinc Road residence following his arrest, the propriety of the jury instructions, and the sufficiency of the convicting evidence.

## I. Motion to Suppress

Prior to trial, the defendant moved to suppress the evidence seized from his home following his arrest. He argued that, because the affidavit in support of the warrant for his arrest contained information that the affiant knew to be false, the warrant was invalid and that exigent circumstances did not exist to justify the warrantless entry into the residence. Additionally, he argued that, even if the warrant was valid, it did not authorize the entry into his residence because the executing officers did not possess a reasonable belief that the defendant was home at that time. He also argued that because the warrant was invalid, his arrest thereon was also invalid, and that, because he was unlawfully removed from his residence, the victim's consent to search the residence was insufficient to permit the officers to search the residence and seize any items therefrom.

At the September 25, 2018 hearing on the defendant's motion, Officer Carver testified that at approximately 2:00 a.m. on September 15, 2017, he responded to a call at 8400 Zinc Road in Knox County. He explained that "the alleged victim's sister" had called to report that the victim had contacted her and "stat[ed] that she was assaulted and for her to please call the police." Officer Carver said that when he and the other officers arrived at the residence, they "attempt[ed] to make contact multiple times for a standard period of time, knocking on all the doors, looking in the windows, just trying to assess the scene." At one point, Officer Carver's "beat partner spoke with the victim's sister. And I called the victim multiple times." He recalled that when the victim eventually "answered the phone, [she] sounded upset, but not hysterically. I asked if she was okay. She stated that she was. I asked her to step outside so we could lay eyes on her, just to do a welfare check." In response, the victim "paused for approximately five, six seconds and then said, 'I can't.'" Officer Carver asked her again to step outside and talk to the officers so that they could be sure she was okay. When the victim paused this time, Officer Carver "could hear slight whispers in the background." At that point, Officer Carver told the victim, "'Well,

-15-

I'm not talking to whoever's with you. I'm talking to you right now.'" He then asked the victim a third time to step outside "and again heard whispers. And she was stating that she was fine and she could not come outside." Officer Carver testified that he found the victim's behavior unusual, so he and the other officers "contacted our supervisors just to . . . let them be aware of the situation. . . . And we were instructed not to" enter the residence. Officer Carver testified that, despite his own misgivings, the officers left the residence as directed.

During cross-examination, Officer Carver said that he "could look in the front door and see into the living room, and there was a TV mounted on the wall and you could see it on." He also observed "an upstairs light on. And as we attempted to make contact several times, you seen a shadow go across . . . a room and then the light shut off."

Detective Ferrell, who was "the family crisis detective on call," received a call at approximately 4:20 a.m. on September 15, 2017, directing him "to contact the officers" that had responded to 8400 Zinc Road. Detective Ferrell learned "that they had got a call for a domestic" and that they had been unable to make physical contact with anyone inside despite having made "several attempts." He also learned that although the officers had not seen "movement coming with inside the house," they "had seen a light come on and off." The senior officer on the scene, Officer Brian Rehg, told Detective Ferrell that officers had spoken with the victim by phone and that during that conversation, "they could hear whispering in the background as if she was being coached as to what to say." In the meantime, officers received a second telephone call from the victim's sister in South Carolina, "who stated that she had received some text messages or some pictures of the victim inside the home that showed some physical injuries." Detective Ferrell directed Officer Rehg to send the photographs to him. Detective Ferrell said that it was not he who told the officers on the scene that they should not attempt to enter the residence.

Detective Ferrell made telephone contact with the victim's sister, Maja Mandusic. He said that as he spoke with Ms. Mandusic, the victim's mother, who was in the same room with Ms. Mandusic, was speaking to the victim on the telephone. Detective Ferrell recalled that he "was relaying communications back and forth between them," explaining, "[T]he victim was talking to the mother and I was talking to the sister, who were side by side. So they were just asking information while she was on the phone." He said that he did not want to ask to speak to the victim directly "[b]ased on what was earlier said about the contact and stuff like that, I didn't want to stir up anything inside the residence. Especially after I was told that there could possibly be weapons inside the home and a three-month-old baby." Detective Ferrell testified that the victim told her mother "that she wanted to seek medical treatment and was hoping to get medical treatment, but that the suspect wouldn't let her leave." He said that he used the information he gleaned during that conversation, the information he received from the officers who responded to

-16-

the scene, and his own viewing of the photographs to fill out the affidavit in support of the arrest warrant.

Detective Ferrell acknowledged that he did not personally speak to the victim at any point before obtaining the warrant but said that he did view the photographs that the victim had sent to her sister. He recalled that the victim sent Ms. Mandusic an email at 2:44 a.m. directing Ms. Mandusic to call the police because the defendant had beaten her. Detective Ferrell said that after he received the arrest warrant, he "called my supervisors and everything who were already at the street, already right next to the residence . . . and told them that I'd obtained a warrant, at which time, they went back to the home." Detective Ferrell testified that the officers unsuccessfully tried to contact the victim by telephone before executing the warrant. Officers then knocked at the door but received no response. At that point, a decision was made to force entry into the residence given that they had information "that there was possibly a gun in the house . . . and due to the fact that there's a three-month-old baby, and now we don't have any contact" with the victim. Detective Ferrell said that officers knew that the defendant was home "[b]ecause my last communication with [Ms. Mandusic] was the communication where he was upstairs and she was downstairs." He added, "[O]fficers arrived back on the scene less than 20 minutes after that and maintained outside the home until that time."

During cross-examination, Detective Ferrell said that after receiving the call from his dispatcher, he "immediately called the unit" and received a briefing from Officer Rehg. After speaking to Officer Rehg, he telephoned his supervisor, who "advised me to go ahead and make contact with [Ms. Mandusic] to find out what exactly was going on that night." He testified that Ms. Mandusic told him that the victim's relationship with the defendant was strained, that the defendant had previously threatened the victim with a gun, and that they had a three-month-old baby. Officer Rehg sent Detective Ferrell photographs depicting the victim with "the busted lip" and "the red mark around the cheek." Later, Detective Ferrell received pictures from Ms. Mandusic that depicted the victim with "redness around the left eye and cheek."

Detective Ferrell said that he left his house at approximately 6:30 a.m. to obtain a signature on the warrant for the defendant's arrest. Other officers were dispatched to the Zinc Road residence at "[a]round 7 a.m. Dayshift came on at six. And my supervisor called their supervisors and . . . they went out there." Those officers kept the residence under surveillance until other officers arrived to execute the arrest warrant at approximately 8:00 a.m. When officers attempted to serve the warrant, no one answered the door, so officers forced their way inside.

Detective Ferrell recalled that security cameras blanketed the exterior of the home so that, had the victim attempted to leave, she would have been seen. Detective

Ferrell acknowledged that he did not specify in his affidavit that the photographs and information had been filtered through Ms. Mandusic, but he did list her as a witness in the warrant.

At the conclusion of the hearing, the trial court observed that the affidavit in support of the arrest warrant was "a synopsis of information derived from multiple lines of investigation" and that, although the affidavit did not convey the information "perfectly, . . . perfection is not required." The court concluded that the affidavit provided probable cause to justify the issuance of the warrant. The trial court found that, because the officers had a warrant for the defendant's arrest, they did not have to rely on the exigent circumstances exception to the warrant requirement to enter the Zinc Road residence. The court also found, however, that "this entire situation is an exigency. This is a complaint of injury, some evidence of what could be called kidnapping . . . and a gun, babies. There's certainly circumstances here that create an exigency, but you don't need it anyway." Additionally, the court concluded that, given the early morning hour, it was reasonable for officers to assume that the defendant was in his home and that, more importantly, the officers had real time information from "the victim, the sister[,] and the mother" about "which room of the house he's located in." The court determined that the officers "had a reasonable basis for believing the defendant was inside the premises. And when they didn't open the door, that gave the officers all the . . . legal right they needed to enter with whatever degree of violence was necessary."

## A. Warrant

The defendant first asserts that the warrant for his arrest was invalid because the affidavit in support of the warrant prepared by Detective Ferrell contained false or misleading information. The warrant, which was exhibited to the hearing, contained the following:

> DEFENDANT COMMITTED THE OFFENSE OF DOMESTIC ASSAULT, IN VIOLATION OF TCA SECTION 39-13-111. THIS INCIDENT OCCURRED ON OR ABOUT FRIDAY, SEPTEMBER 15, 2017 AT 2:00 OFFICERS RESPONDED TO 8400 ZINC RD. ON A DOMESTIC MATTER. UPON OFFICERS ARRIVAL THEY WERE UNABLE TO MAKE CONTACT WITH THE VICTIM DUE TO NO ANSWER AT THE DOOR. OFFICERS MADE CONTACT VIA CELL PHONE AND THE VICTIM, MRS. JELENA EDWARDS STATED SHE COULD NOT COME OUT AND WHEN ASKED WHY SHE STATED I JUST CANT. OFFICERS HEARD A MALE

VOICE WHISPERING TO HER AND THEN SHE WOULD ANSWER QUESTIONS. THE VICTIM WAS ABLE TO GET HER PHONE AND TAKE PICTURES WHICH SHOWED REDNESS AND SWELLING ON BOTH CHEEKS AND A BLOODY LIP. THE VICTIM THEN STATED FOR HER SISTER TO CALL THE COPS BECAUSE SHE HAD THE SHIT BEAT OUT OF HER. VICTIM STATED THAT THE DEFENDANT, JAY EDWARDS WAS THE ONE THAT DID THIS TO HER. SHE STATED HE ALSO HIT HER IN THE RIBS AND STOMACH AREA. VICTIM STATED SHE IS SCARED AND WANTED HER TO CALL THE COPS. VICTIMS INJURIES ARE CONSIST[E]NT WITH HER STATEMENT. A CITATION WAS NOT ISSUED BECAUSE DEFENDANT NOT IN CUSTODY WHEN WARRANT ISSUED.

The defendant claims that the affidavit is misleading because Detective Ferrell did not make it clear that he received the information contained therein from other officers and Ms. Mandusic.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).

Both the federal and state constitutions offer protection from unreasonable searches and seizures with the general rule being "that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression." *State v. Talley*, 307 S.W.3d 723, 729 (Tenn. 2010) (citing U.S. Const. amend. IV; Tenn. Const. art. I, § 7).

"Arrest warrants may only issue upon a showing of probable cause." *State v. Lewis*, 36 S.W.3d 88, 97 (Tenn. Crim. App. 2000). Tennessee Rule of Criminal Procedure 3 provides that "[t]he affidavit of complaint" in support of an arrest warrant "must: (a) be in writing; (b) be made on oath before a magistrate or a neutral and detached court clerk authorized by Rule 4 to make a probable cause determination; and (c) allege the essential facts constituting the offense charged." Tenn. R. Crim. P. 3. "If hearsay evidence

is relied upon, the basis for the credibility of both the informant and the informant's information must also appear in the affidavit." Tenn. R. Crim. P. 3, Advisory Comm'n Comments (citation omitted). Similarly, Tennessee Rule of Criminal Procedure 4 provides that "[t]he finding of probable cause shall be based on evidence which may be hearsay in whole or in part provided there is a substantial basis to believe: (1) the source of the hearsay is credible; and (2) there is a factual basis for the information furnished." Tenn. R. Crim. P. 4(b).

Detective Ferrell did not explicitly indicate that the information in the affidavit was gleaned from other officers and from Ms. Mandusic; neither did he explicitly indicate that he received the information personally from the victim. His references to information gleaned by "Officers," "they," and "her sister" created a reasonable inference that the information was not obtained by Detective Ferrell directly. Additionally, the listing of Ms. Mandusic as a witness on the warrant suggests that she was, in fact, a witness, that is, a person "who has firsthand knowledge of something based on the witness's perceptions through one or more of the five senses." *Witness*, Black's Law Dictionary (11th ed. 2019). Consequently, we agree with the trial court that the affidavit did not contain any misleading information.

In the context of an affidavit in support of a search warrant, this court has observed that "[a]lthough we agree that an informant's status, i.e. the facts and circumstances surrounding the giving of information, is generally relevant to the issue of credibility," "the omission of information concerning the informant's status" is not always "fatal to the search warrant." *State v. Yeomans*, 10 S.W.3d 293, 297 (Tenn. Crim. App. 1999) (citations omitted). Additionally, we do not agree that the omission from the affidavit of the victim's statements to her mother and to Officer Carver that she was "fine" or "okay" had any impact on the probable cause finding given the circumstances attendant to the statements. Officer Carver stated that a man, presumably the defendant, could be heard whispering to the victim when she made the statement, and evidence in the form of text messages corroborated the defendant's commandeering of the victim's cellular telephone. To be sure, the information contained within the affidavit was accurate[1] and sufficient to support a finding of probable cause.

## B. Entry into the Residence

The defendant next asserts that exigent circumstances did not permit the officers' warrantless entry into the Zinc Road residence. Because we have determined that the warrant for the defendant's arrest was valid, we need not determine whether the exigent

---

[1] The only discrepancy we found between the affidavit and the evidence adduced at trial was the use of the word "s***" instead of the word "crap." Given that the two words are synonymous, it is a distinction without a difference.

circumstances exception to the warrant requirement justified the entry. *See Payton v. New York*, 445 U.S. 573, 603 (1980) (stating that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within"). Tennessee law specifically provides that, "[t]o make an arrest, either with or without a warrant, the officer may break open any outer or inner door or window of a dwelling house if, after notice of the officer's office, authority and purpose, the officer is refused admittance." T.C.A. § 40-7-107; *see also* T.C.A. § 40-6-201 ("A warrant of arrest is an order, in writing, stating the substance of the complaint, directed to a proper officer, signed by a magistrate, and commanding the arrest of the defendant."). We agree with the trial court that the early hour, the "real time" information communicated to the officers from the victim via Ms. Mandusic, and the officer's surveillance of the residence prior to the execution of the warrant provided the officers with reason to believe that the defendant was home when they executed the arrest warrant.

## C. Victim's Consent to Search

The defendant, citing *Fernandez v. California*, 571 U.S. 292 (2014), originally posited that because his arrest was illegal, the victim's consent was insufficient to permit the search of the Zinc Road residence. In *Fernandez*, however, the Court observed that "a physically present inhabitant's express refusal of consent to a police search" operates as an exception to the general rule that "consent by one resident of jointly occupied premises is generally sufficient to justify a warrantless search" "only when the objector is standing in the door saying 'stay out' when officers propose to make a consent search." *Fernandez v. California*, 571 U.S. 292, 300, 306 (2014) (quoting *Georgia v. Randolph*, 547 U.S. 103, 122-23 (2006)). Additionally, the Court held "that an occupant who is absent due to a lawful detention or arrest stands in the same shoes as an occupant who is absent for any other reason." *Fernandez*, 571 U.S. at 300. Because the defendant was absent from the residence he shared with the victim due to his lawful arrest, her consent to search the residence, given in his absence, was sufficient to permit the officers to search.

## II. Jury Instructions

### A. Constructive Amendment

The defendant next challenges the propriety of the jury instructions related to the charge of aggravated kidnapping. He asserts that the trial court's instruction on this offense permitted the jury to convict him of an offense not charged in the indictment and that, consequently, the erroneous instruction resulted in a constructive amendment of the indictment. The State contends that the defendant waived plenary review of this issue by failing to lodge a contemporaneous objection to the instructions and by failing to include

the issue as a ground for relief in his motion for a new trial. The State further contends that the defendant cannot establish entitlement to relief via plain error because the court's instruction broke no clear and unequivocal rule of law.

As indicated, the defendant was charged in Counts 1 and 2 of the indictment with alternative counts of especially aggravated kidnapping. Count 1 alleged especially aggravated kidnapping accomplished with a deadly weapon, *see* T.C.A. § 39-13-305(a)(1), while Count 2 charged especially aggravated kidnapping where the victim suffered serious bodily injury, *see id.* § 39-13-305(a)(4). Count 3 charged the offense of aggravated kidnapping "[w]hile the defendant is in possession of a deadly weapon or threatens the use of a deadly weapon." *See id.* § 39-13-304(a)(5). Count 3 was clearly a lesser included offense of Count 1 that need not, and arguably should not, have been pleaded as a separate count of the indictment. *See id.* § 40-18-110.

The trial court provided the following jury instructions for these offenses:

The defendant is charged in Count 1 and 2 of the Indictment with the offense of especially aggravated kidnapping. To this offense he has entered a plea of not guilty.

Any person who commits an especially aggravated kidnapping is guilty of a crime.

For you to find the defendant guilty of the offense charged in Count 1, the State must have proven beyond a reasonable doubt the existence of the following essential elements:

(1) that the defendant knowingly confined another unlawfully so as to interfere substantially with the other's liberty; and

(2) that the confinement was accomplished with a deadly weapon.

For you to find the defendant guilty of the offense as charged in Count 2, the State must have proven beyond a reasonable doubt the existence of the following essential elements:

-22-

(1) that the defendant knowingly confined another unlawfully so as to interfere substantially with the other's liberty; and

(2) that the alleged victim suffered serious bodily injury during the removal or confinement.

. . . .

Should you find the defendant not guilty of especially aggravated kidnapping, or if you have a reasonable doubt as to his guilt, then you must acquit him of this offense. You must then consider whether or not the defendant is guilty of aggravated kidnapping, which is a lesser-included offense.

The elements of aggravated kidnapping will be defined for you later in these instructions.

. . . .

The defendant is charged in Count 3 of the Indictment with the offense of aggravated kidnapping. To this offense . . . he has entered a plea of not guilty.

Any person who commits the offense of aggravated kidnapping is guilty of a crime.

For you to find the defendant guilty of the offense as charged in Count 3, the State must have proven beyond a reasonable doubt the existence of the following essential elements:

(1) that the defendant knowingly confined another unlawfully so as to interfere substantially with the other's liberty; and

(2) that the alleged victim suffered bodily injury.

For you to find the defendant guilty of the offense as charged in Count 3, the State must have proven beyond a reasonable doubt the existence of the following elements:

-23-

> (1) that the defendant knowingly confined another unlawfully so as to interfere substantially with the other's liberty; and

> (2) that the defendant possessed or threatened the use of a deadly weapon.

As the State correctly points out, the defendant did not challenge the jury instructions either at trial or in his motion for new trial. In consequence, as the defendant concedes, he has waived plenary review of this issue. Whether properly assigned or not, however, this court may, "[w]hen necessary to do substantial justice, . . . consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial." Tenn. R. App. P. 36(b). This court will grant relief for plain error only when:

> (1) the record clearly establishes what occurred in the trial court; (2) the error breached a clear and unequivocal rule of law; (3) the error adversely affected a substantial right of the complaining party; (4) the error was not waived for tactical purposes; and (5) substantial justice is at stake; that is, the error was so significant that it "probably changed the outcome of the trial."

*State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010) (quoting *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000)). The party claiming plain error bears the burden of satisfying all five criteria as a prerequisite to plain error review. *See id.* Because each factor must be established, we need not consider all five factors when a single factor indicates that relief is not warranted. *State v. Fayne*, 451 S.W.3d 362, 372 (Tenn. 2014) (citing *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007)). "[A]n error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." *Fayne*, 451 S.W.3d at 372 (citation omitted) (alterations in *Fayne*).

A variance results when the evidence at trial does not correspond to the elements of the offense alleged in the charging instrument. *State v. Keel*, 882 S.W.2d 410, 416 (Tenn. Crim. App. 1994). In many such cases, the evidence establishes the commission of an offense different from the offense alleged in the charging instrument. *See id.* The variance rule is predicated upon the theory that an accused cannot be charged with one offense and convicted of a completely different offense. *See id.* A variance is not fatal unless it can be "deemed to be material and prejudicial." *State v. Moss*, 662

S.W.2d 590, 592 (Tenn. 1984). A variance will not be deemed material and prejudicial in cases where "the allegations and proof substantially correspond, the variance is not of a character which could have misled the defendant at trial and is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." *Id.* Related to a variance, a constructive amendment of the indictment occurs "when the jury is permitted to convict the defendant upon a factual basis that effectively modifies an essential element of the offense charged." *State v. Goodson*, 77 S.W.3d 240, 244 (Tenn. Crim. App. 2001). When a constructive amendment occurs, reversal is said to be "automatic, because the defendant may have been convicted on a ground not charged in the indictment." *Id.* The logic is that a constructive amendment of the indictment, not consented to by the defendant, does not accomplish the "overriding purpose of notice to the accused" required of an indictment. *See State v. Hammonds*, 30 S.W.3d 294, 300 (Tenn. 2000). With these principles in mind, we review the defendant's challenge to the jury instructions.

### Counts 1 and 2

As indicated, the trial court properly instructed the jury as to the essential elements of the charged offense of especially aggravated kidnapping in Counts 1 and 2. The trial court then instructed the jury that, should it find the defendant not guilty of especially aggravated kidnapping, it should proceed to consider the lesser included offense of aggravated kidnapping, which the court would define later in the instructions. Then, when instructing the jury on Count 3, a stand-alone count that charged aggravated kidnapping, a lesser included offense of Count 1, the trial court provided a definition of that offense that included the elements that "the victim suffered bodily injury" and that "the defendant possessed or threatened the use of a deadly weapon." These elements align with and present a lesser culpability than Counts 1 and 2, but the trial court made no effort to specify which elements went with which count and, indeed, did not explicitly refer back to those counts. The better practice would have been for the trial court to define each lesser included offense immediately after the greater offense. Examining the trial court's mistake via the lens of plain error review, however, we find that the defendant cannot establish entitlement to plain error relief because he has failed to establish that a clear and unequivocal rule of law was breached. Additionally, when viewed as a whole, we cannot say that the court's decision to give the instructions in this order resulted in an error so significant as to "probably change[] the outcome of the trial." *Hatcher*, 310 S.W.3d at 808 (Tenn. 2010) (quoting *Smith*, 24 S.W.3d at 282-83).

### Count 3

As an initial matter, we easily reject the State's assertion that "[t]he additional instruction regarding aggravated assault involving bodily injury was mere

surplusage for the purposes of Count 3." A surplusage issue is one of variance when the State fails to prove the existence of a fact that was alleged, albeit gratuitously, in the charging instrument. In this context, "surplusage" implicates an evidence-sufficiency issue. That being said, "[g]enerally, unless the matters alleged in the indictment are essential elements of the crime, they may be disregarded in analyzing the sufficiency of the convicting evidence." *State v. March*, 293 S.W.3d 576, 589 (Tenn. Crim. App. 2008) (citing *Church v. State*, 333 S.W.2d 799, 809 (Tenn. 1960)). The issue in this case is not that the State failed to prove a gratuitous fact that was alleged in the indictment but that the State proved a fact *not* alleged in the indictment for Count 3.

Here, the State charged the defendant in Count 3 with aggravated kidnapping "[w]hile the defendant is in possession of a deadly weapon or threatens the use of a deadly weapon." By alleging a specific mode of liability, the State was obliged to prove that mode of liability and was precluded from achieving a conviction under a mode of liability different than that alleged in the indictment. *See Goodson*, 77 S.W.3d at 244 ("Put simply, not only must the government prove the crime it charges, it must charge the crime it proves."); *see also, e.g.*, *State v. Paul Richardson*, No. W2008-02506-CCA-R3-CD (Tenn. Crim. App., Jackson, Sept. 29, 2010) (constructive amendment and fatal variance occurred when the trial court instructed the jury on aggravated assault by intentionally and knowingly causing another to reasonably fear imminent bodily injury but the indictment charged the defendant with aggravated assault by knowingly causing bodily injury to another); *State v. Jamie Roskom*, No. M2006-00764-CCA-R3-CD (Tenn. Crim. App., Nashville, Feb. 9, 2007) (constructive amendment and fatal variance occurred in prosecution of violation of the sexual offender registry act when indictment alleged failure to timely register but proof showed the defendant's failure to report to local law enforcement agency within a week of his birthday); *State v. Atta Najjar*, No. W2003-00329-CCA-R3-CD (Tenn. Crim. App., Jackson, Jan. 21, 2004) (constructive amendment and fatal variance occurred when jury instruction in aggravated rape case allowed conviction based upon a theory of aggravated rape not alleged in the indictment). Because the trial court's instruction invited the jury to convict the defendant of aggravated kidnapping in Count 3 if it found that the victim suffered bodily injury, it permitted the jury to convict the defendant "on a ground not charged in the indictment," *see State v. Goodson*, 77 S.W.3d 240, 244 (Tenn. Crim. App. 2001) (citation omitted), and, in consequence, resulted in a constructive amendment of the indictment.

Filtering the error through a plain error analysis, we see that the record clearly establishes that the trial court provided an incorrect instruction for the elements of Count 3 and that the instruction breached "a clear and unequivocal rule of law" because it permitted the jury to convict the defendant on grounds not charged in the indictment for that count. Conviction of an offense not charged in the indictment would certainly adversely affect a substantial right of the accused because a constructively amended

indictment does not provide "notice of the offense charged, provide the court with an adequate ground upon which a judgment may be entered," or, arguably, "provide the defendant with protection against double jeopardy." *Id.* It is not clear, however, that "substantial justice is at stake" because we cannot say that "the error was so significant that it 'probably changed the outcome of the trial.'" *Hatcher*, 310 S.W.3d at 808 (quoting *Smith*, 24 S.W.3d at 282-83). Unlike most of the constructive amendment cases addressed by this court, in this case the trial court did instruct the jury on the correct mode of liability charged in the indictment, *and* the evidence was sufficient to support a finding of guilt for that mode of liability. To be sure, "the allegations and proof substantially correspond[ed]," and "the variance is not of a character which could have misled the defendant at trial and is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." *Moss*, 662 S.W.2d at 592. Said differently, because the trial court provided both a correct and an incorrect statement of the elements charged in Count 3 and because sufficient evidence existed to support a conviction under the correct alignment of elements, we cannot say with certainty that the incorrect instruction necessarily resulted in the jury's convicting the defendant based upon an uncharged mode of liability in that count. Consequently, we cannot conclude that the error was so significant that it probably changed the outcome of the trial, and, as a result, the defendant has failed to satisfy the criteria for plain error review.

Although we have concluded that the jury instruction error here did not entitle the defendant to plain error relief, we would be remiss not to mention that the error can be directly attributed to the State's unfathomable decision to charge the lesser included offense of aggravated kidnapping in Count 3. This court has warned the State that indictments of this kind, in addition to being unconstitutionally multiplicitious, "serve no legal purpose and instead serve only to invite confusion and error." *State v. Brandon Middlebrook*, No. E2019-01503-CCA-R3-CD, slip op. at 36-37 (Tenn. Crim. App., Knoxville, Jan. 5, 2021); *see also State v. Darius Patterson*, No. E2019-01173-CCA-R3-CD, slip op. at 11 n.2 (Tenn. Crim. App., Knoxville, July 14, 2020); *State v. Odell Glass*, No. E2019-00965-CCA-R3-CD, slip op. at 8 n.1 (Tenn. Crim. App., Knoxville, June 9, 2020). Had the State not charged aggravated kidnapping in a separate count, the trial court likely would have provided the instructions for that offense immediately following those for the charged offense, thus simplifying the instructions, instilling greater confidence in the jury's verdict, and conserving the time and resources that have been devoted to this issue.

## B. State v. White

The defendant argues that the trial court erred by failing to instruct the jury that it must also determine that the victim's confinement exceeded that to commit the lesser included offense of assault. Again, because the defendant failed to object to the jury

instructions at trial and failed to raise the issue in his motion for new trial, we examine his claim for plain error.

In *State v. White*, our supreme court ruled that, to protect the defendant's due process rights in those cases where the defendant was charged with a kidnapping offense and any overlapping felonies that, by their elements necessarily include a period of confinement, the jury should be instructed that it must determine that the removal or confinement of the victim was "significant enough, standing alone" to support a conviction of kidnapping before imposing one when an overlapping felony accompanies the kidnapping charge. *See State v. White*, 362 S.W.3d 559, 578 (Tenn. 2012). To this end, the supreme court developed a jury instruction to facilitate the jury's determination of whether the removal or confinement was essentially incidental to the accompanying offense. *See id.* at 580-81.

Here, the trial court provided the instruction first promulgated by the supreme court in *White* and "subsequently adopted by the Tennessee Pattern Jury Instruction Committee." *State v. Alston*, 465 S.W.3d 555, 562 (Tenn. 2015) (citing 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 8.01-.03, 8.05). The trial court in this case instructed the jury that it must determine whether the victim's confinement exceeded that necessary to commit the aggravated assault of the victim as charged in Counts 4, 5, and 6. Later, the court instructed the jury that assault is a lesser included offense of aggravated assault as charged in those counts. Viewing the instructions as a whole, we conclude that the trial court's failure to specifically enumerate the lesser included offense of assault in its *White* instruction did not breach a clear and unequivocal rule of law, and, in consequence, the defendant cannot establish entitlement to plain error relief.

## III. Sufficiency

The defendant challenges the sufficiency of the evidence for his convictions of aggravated kidnapping, arguing that the State failed to establish the element of "confinement, particularly of any confinement that went beyond that necessary to constitute the assault offenses." He claims that, because the victim "was free to move around the house throughout the evening," she was not actually confined.

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of

the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[a]ggravated kidnapping is false imprisonment, as defined in § 39-13-302, committed . . . [w]here the victim suffers bodily injury; or . . . [w]hile the defendant is in possession of a deadly weapon or threatens the use of a deadly weapon." T.C.A. § 39-13-304(4)(5). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." *Id.* § 39-13-30(a). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." *Id.* § 39-11-106(a)(3). "'Deadly weapon' means . . . [a] firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury." *Id.* § 39-11-106(a)(6)(A). "So long as the removal or confinement of the victim lasts, the offense of false imprisonment continues." *State v. Legg*, 9 S.W.3d 111, 117 (Tenn. 1999).

The evidence at trial established that the defendant initially restrained the victim inside the laundry room of the house, where he physically assaulted her. Even after he allowed her to leave the laundry room, he threatened her with a gun, even forcing her to observe that the gun was loaded. When the police arrived, he physically confined her to a bathroom and then the master bedroom. The defendant refused to allow the victim to open the door to the police. Throughout the evening, the defendant continued his periodic outbursts of physical violence, resulting in extensive bruising to the victim's face and body. In addition to his intimidation by physical violence, the defendant kept his loaded gun near him at all times. Although the victim had some freedom to move about the house, the defendant continued to check on her, periodically deprived her of her cellular telephone, and continued "pacing the house." From these facts, a rational trier of fact could have concluded beyond a reasonable doubt that the defendant confined the victim so as to substantially interfere with her liberty.

## IV. Other Issues

Although not raised by the parties, we perceive an error that requires our attention.

The defendant was charged with aggravated assault in Counts 4, 5, and 6 and with domestic assault in Count 8. There was some suggestion during closing arguments that those counts were based upon separate acts, but the State did not make an election of

-29-

offenses, and, following the defendant's conviction, the State did not seek a merger of those convictions.

When the evidence adduced at trial indicates that the defendant has committed more offenses against the victim than were charged in the indictment, the State must elect the facts upon which it intends to rely for each count of the indictment in order to protect "the defendant's state constitutional right to a unanimous jury verdict by ensuring that jurors deliberate and render a verdict based on the same evidence."[2] *State v. Johnson*, 53 S.W.3d 628, 631 (Tenn. 2001); *see also State v. Kendrick*, 38 S.W.3d 566, 568 (Tenn. 2001); *State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999); *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997). The election requirement arises most often when a defendant is alleged to have performed multiple sexual acts over a lengthy period of time against young children who are unable to provide the exact date on which any one act occurred. *See, e.g.*, *Johnson*, 53 S.W.3d at 631; *Brown*, 992 S.W.2d at 391-92. "Because the election requirement safeguards a criminal defendant's fundamental, constitutional right to a unanimous jury verdict, errors pertaining to the sufficiency of the prosecution's election are subject to plain error review." *State v. Knowles*, 470 S.W.3d 416, 424 (Tenn. 2015) (citing *Burlison v. State*, 501 S.W.2d 801, 804 (Tenn. 1975); *Kendrick*, 38 S.W.3d at 567; *Walton*, 958 S.W.2d at 726-27 (Tenn. 1997); *State v. Clabo*, 905 S.W.2d 197, 204 (Tenn. Crim. App. 1995)). "When applying plain error review," we are mindful "that the election requirement is merely a means by which to protect the right to a unanimous verdict. There is no right to a perfect election, and . . . the election requirement may be satisfied in a variety of ways." *Knowles*, 470 S.W.3d at 424. Importantly, "the election requirement applies to offenses, not to the facts supporting each element of the offense." *Id.*

---

[2] Our prior decisions with regard to juror unanimity are moored in state constitutional law because, until very recently, the Supreme Court had not concluded that the Sixth Amendment right to a jury trial as incorporated via the 14th Amendment required a unanimous jury verdict. In *Ramos v. Louisiana*, however, the Court concluded:

> There can be no question either that the Sixth Amendment's unanimity requirement applies to state and federal criminal trials equally. This Court has long explained that the Sixth Amendment right to a jury trial is "fundamental to the American scheme of justice" and incorporated against the States under the Fourteenth Amendment. This Court has long explained, too, that incorporated provisions of the Bill of Rights bear the same content when asserted against States as they do when asserted against the federal government. So if the Sixth Amendment's right to a jury trial requires a unanimous verdict to support a conviction in federal court, it requires no less in state court.

*Ramos v. Louisiana*, 590 U.S. \_\_\_\_, 140 S. Ct. 1390, 1397 (2020) (citations omitted).

Here, the evidence established that the defendant held the victim captive in their home through the evening of September 14, 2017, and into the morning hours of September 15, 2017, and that, during that period of time, the defendant subjected the victim to a series of physical attacks and more than one threat at the point of his gun. The State charged the defendant with four assaultive offenses but did not make an election as to which physical attack or threat aligned with each of the four charges, and the proof established more than four separate attacks and/or instances of threatening behavior. As the State's closing argument suggests, however, this was actually "a long process" of a single, continuing assault committed via different modes of liability instead of separate offenses. The State observed that the "fight" began in the laundry room and "continue[d] from the laundry room" into the "living room. It's sometime after 10:15, 10:30, and the fight has continued." The State noted that, after the defendant "makes that threat to [the victim] about the bullet in the chamber, the assaultive behavior continues. It continues, ladies and gentlemen, for an extremely long time. . . . And that's on repeat for a long time." The prosecutor also noted that "the fight doesn't pause for her to feed her own child. He continues to slap her around."

The State did not make an election of offenses at the close of its case-in-chief but did make some attempt to differentiate between the charged assaults during its closing argument; thus, the record clearly indicates what happened in the trial court, the first prerequisite to plain error review. *See Knowles*, 470 S.W.3d at 425. Observing that "this fight has been going on for several hours," the State argued that Count 4 was related to "the nature of the victim's injuries" specifically. For Count 5, the State directed the jury's attention to "the assaults that are occurring . . . when he puts that gun down. It's put down, the slaps occur, the hits continue." As to Count 6, the prosecutor asserted that that count related to the various instances of the defendant's threatening the victim with the gun, saying, "All of those lead to that." As an election of offenses, however, the State's argument did not contain sufficient information to safeguard the defendant's state constitutional right to a unanimous verdict in Count 4, 5, 6, and 8, which error "breached a clear and unequivocal rule of law" and "adversely affected a substantial right" of the defendant. *Knowles*, 470 S.W.3d at 425.

If the proof is viewed, however, as a single, ongoing instance of assault committed via different modes of liability, no election of offenses was required and jury unanimity is not implicated.[3] *See State v. Keen*, 31 S.W.3d 196, 208 (Tenn. 2000) ("Our

---

[3] This same reasoning permits the defendant's single conviction of interfering with an emergency call despite that the evidence showed that the defendant confiscated and returned the victim's cellular telephones more than once and that he physically prohibited her from answering the door for the police when they arrived the first time. Indeed, the State, in its closing argument, stated that "[y]ou have several examples of that in this case." "[T]here is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict." *Keen*, 31 S.W.3d at 209.

research reveals no case, however, in which we have held that the right to a unanimous jury verdict encompasses the right to have the jury unanimously agree as to the particular theory of guilt supporting conviction for a single crime.").  When the proof establishes a single offense committed by different means, the defendant's convictions must be merged to satisfy double jeopardy principles.  The failure to do so results in plain error.  Although the sentences for the defendant's convictions in Counts 4, 5, 6, and 8 are aligned concurrently, the Supreme Court has held that where separate convictions violate double jeopardy principles because the legislature has not authorized multiple punishments, the imposition of concurrent sentences does not alleviate the violation because "the second conviction, even if it results in no greater sentence, is an impermissible punishment." *Rutledge v. United States*, 517 U.S. 292, 302 (1996).  Consequently, we remand the case for the entry of corrected judgment forms reflecting that the defendant's three convictions of assault and his conviction of domestic assault are merged.

*V.  Conclusion*

Based upon the foregoing analysis, we affirm the judgments of the trial court but remand the case for the entry of corrected judgments reflecting the merger of the defendant's assault convictions.

_____

JAMES CURWOOD WITT, JR., JUDGE